# United States District Court
## Western District of Virginia
## Harrisonburg Division

_____ )
                                      )
**BONNIE S. BARTON,**                 )          Civil No.: 5:13cv00050
                                      )
                *Plaintiff,*          )
**v.**                                )          **REPORT AND**
                                      )          **RECOMMENDATION**
**CAROLYN W. COLVIN**,                )
Commissioner of the Social Security   )
Administration                        )
                                      )          By:  Hon. James G. Welsh
                *Defendant*           )               U. S. Magistrate Judge
_____ )


Bonnie S. Barton brings this civil action challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying her application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416(i) and 423. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g).

## I.  ADMINISTRATIVE AND PROCEDURAL HISTORY

Claiming that she has been disabled and unable to work due residual wrist and arm pain associated with an August 1991 work-related injury to her right (non-dominant) distal ulnar joint, the plaintiff protectively filed for DIB on March 7, 1997 (R. 13, 17-18, 74, 148-152, 154-155, 181, 185, 187-188, 374, 521). This disability, she alleges, began on December 22, 1994, when her employer closed the clothing factory where she worked for various periods as a knitting machine operator, inspector and security guard (R. 16, 17, 19, 36, 45-46, 140, 374, 434, 558). Her claim was denied initially on May 13, 1997 (R. 61-62, 65-67). On August 18, 1997 it was

denied on reconsideration (R. 63-64, 69-71), and following an administrative hearing held on January 26, 1998 (R. 35-60) it was denied by written administrative law judge ("ALJ") decision dated April 13, 1998 (R. 13-22).

The Appeals Council's subsequently denied her review request (R. 6-8), and the plaintiff sought court review pursuant to 42 U.S.C. § 405(g). On the basis of new evidence provided on administrative appeal, the magistrate judge issued a Report in which he recommended reversing the Commissioner's decision and allow the ALJ "to consider the evidence regarding the plaintiff's limitations before expressing his opinion about the availability of gainful activity" (R. 376). On March 29, 2000 the Report (R. 374-377) was adopted in its entirety; the decision denying the plaintiff's DIB claim was reversed pursuant to sentence four of 42 U.S.C. § 405(g), and the matter was remanded to the Commissioner for further proceedings (R. 372-373, 378).

The Appeals council thereafter vacated the Commissioner's decision and remanded the matter to the ALJ "for further proceedings consistent with the order of the court" (R. 378-379); on October 3, 2000 a supplemental hearing was held before a second ALJ (R. 430-446), and on February 28, 2001 a new written decision was issued (R. 361-370, 521). In response to this adverse result, the plaintiff sought Appeals Council review on the basis of a legally insufficient functional capacity determination. Concluding that the ALJ's hypothetical question "provided a thorough rationale for his functional capacity [finding]," the Appeals Council denied her review request (R. 351-352, 521); once again the plaintiff filed for court review (*Barton v. Barnhart*, 5:03cv00049 (WDVa. Jun. 9, 2003) (docket #3)), and for a second time the magistrate judge reviewed the administrative record. He determined that the Commissioner had discharged the agency's burden at the fifth decisional step "to demonstrate that alternate gainful activity was available to [the plaintiff]," and he recommended entry of an order affirming the Commissioner's final determination (*Id.* (docket #6, pp 2-4)). By order entered on May 11, 2004 the magistrate

judge's Report was adopted; the final decision of the Commissioner was affirmed, and this apparently unsuccessful challenge by the plaintiff was dismissed and stricken from the court's docket. *Id*. (docket #8). (*See* R. 496, 521).

Asserting an essentially identical claim, [1] the plaintiff almost immediately re-filed for DIB (R. 475, 521, 558-560). This claim too was denied initially and on reconsideration (R.475). Citing both *res judicata* and her long-past date last insured (December 31, 1999), the plaintiff's request for an administrative hearing was dismissed on January 13, 2007 by a third ALJ (R. 475). After successfully obtaining Appeals Council review of the ALJ's dismissal her re-filed claim (R. 521-523, 493-494), the Council concluded that *res judicata* did not apply to the plaintiff's second application, because of the extensive revisions to musculoskeletal listings in the interim made the "'issues'… different" and a new substantive decision should be issued (R. 522). The ALJ's dismissal, therefore, was vacated on September 13, 2009 and the claim administratively remanded (R. 467-471, 491, 521-523). [2]

Pursuant thereto, a new administrative hearing was held on April 5, 2010. At which time the ALJ heard testimony from the plaintiff, her husband, a medical witness and a vocational witness, and he also heard the argument of plaintiff's council (R. 475, 897-942). The plaintiff contended that her functional capacities had been severely and permanently limited since December 1994 due to depression, an attention deficit disorder, obesity and chronic residual wrist, arm and shoulder pain stemming from her 1991 injury and the subsequent surgical repair of her right (non-dominant) wrist (R. 481-482, 906-909, 915-916).

---

[1]  The only difference was the alleged onset date of December 31, 1994 instead of December 22, 1994 (*See* R. 13, 521).

[2]  Noting that the plaintiff had also filed a third DIB claim on July 8, 2009, which was effectively a duplicate claim, the Appeals Council in its remand order directed the ALJ to "issue a new decision" on this associated claim (R. 523).

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520, a third different ALJ made his review and assessment of the record. He too concluded the plaintiff was not disabled prior to December 31, 1999 (the expiration date of her insured status), and on July 10, 2010 he issued yet another new substantive decision consistent with the Appeals Council's remand order (R. 475-488. 497-499, 501-503, 897-942). However, in reversing his assessment, the Appeals Council concluded the ALJ had not fully considered the plaintiff's maximum functional capacity and had not provided adequate references in his decision to the specific supporting evidence (R. 490-492, 454). Consequently, the plaintiff's claim was remanded once again for another administrative hearing and for additional vocational testimony (*Id.*).

Consistent with this remand, an administrative hearing was held before a fourth ALJ on August 30, 2012 (R. 841-896); additional vocational and other testimony was heard, and a new ALJ decision was thereafter issued on September 13, 2012 (R. 454-466). Once again, the plaintiff's DIB claim was denied (R. 454-466), and this time her request for administrative review (R. 594-595) was also denied by the Appeals Council (R. 447-450). Therefore, this most recent ALJ decision stands as the final decision of the Commissioner for purposes of the court's current judicial review. *See* 42 U.S.C. §§ 405(g).

Along with her Answer (docket #5) to the plaintiff's Complaint (docket #3), the Commissioner has filed a certified copy of the Administrative Record ("R.") (docket #7), which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. Each party has moved for summary judgment (docket # 10 and # 14) and filed a supporting memorandum of points and authorities (docket # 11 and # 15). Oral argument was conducted on March 27, 2014 with the parties' counsel each appearing telephonically (docket #

17).  By standing order this case is now before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.  ALJ's FINDINGS

In his written decision, the ALJ made his findings and conclusions pursuant to the agency's five-step decisional process.  After reaffirming that Ms. Barton insured status for DIB expired December 31, 2009 (R. 454, 457), he found that she had not engaged in work activity after her alleged disability onset date of December 30, 1994 (R. 457).  Consistent with the principles of finality and fundamental fairness articulated by the Fourth Circuit in *Albright v. Commissione*r, 174 F.3$^d$ 473 (4th Cir. 1999) (interpreting *Lively v. Secretary, HHS*, 820 F.2$^d$ 1391 (4th Cir. 1987)), [3]  the ALJ considering the administrative findings made by the ALJ in a written decision dated in February 2001 [4]  following the second administrative hearing and gave "great weight" to those earlier findings (R.455).  Therein, among other findings, the ALJ noted that the plaintiff had in fact actively looked for work and applied to attend school after her alleged onset date, which "show[ed] that [she] was not as limited as [she] alleged" (R. 457).  In addition to finding the *severe* [5]  impairments identified by the ALJ in the February 2001 decision to be "consistent with the evidence," the ALJ found the following *severe* impairments: residuals of right shoulder surgery, numbness in the right hand, obesity, depression and anxiety (R. 457).

At step three of the agency's decisional process, the ALJ determined that through her date last insured Ms. Barton's impairments did not meet the specific requirements of, or

---

[3]  *See* Acquiescence Ruling ("AR") 00-1(4).

[4]  Written decision by ALJ Eugene Bond dated 02/28/2001 (R. 361-370).

[5]  Quoting *Brady v. Heckler*, 724 F.2$^d$ 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2$^d$ 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *See also* 20 C.F.R. §404.1520(c).

medically equal the criteria of, any Listings [6]  (R. 459-461).   In reaching this conclusion the plaintiff's musculoskeletal impairments "in conjunction with [her] obesity" were evaluated by the ALJ under listing sections 1.02 [7] and 1.04. [8]   In making this assessment, he gave "great weight" to the earlier ALJ's step-three findings, and he found the plaintiff's musculoskeletal impairments had not resulted in an inability to ambulate effectively or resulted in an inability to perform fine or gross movements effectively (R.459).   In his evaluation of her neurologic deficit under listings § 11.01 and 11.04B and in conjunction with her obesity, the ALJ found that she had experienced no persistent disorganization of motor function in two extremities, no peripheral neuropathy or  other sustained disturbance of gross or dexterous movements (R. 459).   In his

---

[6]   The Listing of Impairments ("the listings") is in appendix 1 of subpart P of part 404 of 20 C.F.R. It describes for each of the major body systems impairments that the agency considers to be severe enough to prevent an individual from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525.

[7]  **Listing § 1.02. Major dysfunction of a joint(s) (due to any cause):**  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With … [i]nvolvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c ("[T]he inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities….")

[8]  **Listing § 104. Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root … or the spinal cord.  With:**A**. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);OR  **B**. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;  OR  **C**. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b ("**B**…. **1** ...Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence…. **2**…. **(b)**....**(1)** Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities….  **(2)** To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living….

…

consideration of the plaintiff's "body habitus," he concluded that it "may be reasonably anticipated to produce or contribute to [her] symptoms of back or other musculoskeletal pain and could limit mobility and stamina;" however, he specifically found that her obesity in combination with any other severe impairment did not meet a listing (*Id*.).

The ALJ next determining that the plaintiff, during the relevant period, was unable to meet the light to medium exertional demands of her past relevant work (R. 464). After then considering the plaintiff's age, education, work experience, residual functional capacity assessment, and the vocational testimony, the ALJ concluded that through her date last insured there were jobs that existed in significant numbers in the national economy that the plaintiff could perform (R. 465-466).

## III.   SUMMARY AND RECOMMENDATION

Based on a thorough review of the administrative record and for the reasons herein set forth, it is **RECOMMENDED** that the plaintiff's motion for summary judgment be **DENIED**, the Commissioner's motion for summary judgment be **GRANTED**, an appropriate final judgment be entered **AFFIRMING** the Commissioner's decision denying a period of DIB benefits, and this matter be **DISMISSED** from the court's active docket.

## IV.   STANDARD OF REVIEW

The court's review in this case is limited to determining whether the factual findings of the Commissioner are supported by substantial evidence and whether they were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2$^d$ 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" of the evidence. *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966). "If there is evidence to justify a refusal to direct a verdict were

the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan*, 907 F.2<sup>d</sup> 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2<sup>d</sup> at 642). The court is "not at liberty to re-weigh the evidence ... or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3<sup>d</sup> 650, 653 (4th Cir. 2005) (internal quotation marks omitted).

## V. THE ADMINISTRATIVE RECORD

### *Age, Education and Vocational Experience*

Ms. Barton was born in 1964, and she obtained a high school equivalent education (R. 43-44, 433, 465,903). Her past employment included work as a knitting machine operator, quality assurance inspector, and security guard (R. 44-46, 74, 117-129, 216, 464, 887). These jobs were described by the vocational witness as exertionally light to medium and semi-skilled (R. 464,887). The plaintiff has not worked since her employer, an apparel manufacturer, ceased operations in December 1994 (R. 45-47, 434, 437). According to the left hand dominant plaintiff (R.854), she is unable to perform any of these jobs due to depression and the residuals effects (primarily right upper extremity pain) of a work-related injury to her right wrist in 1991(R. 464, 854-860).

### *Relevant Medical Evidence*

In August 1991, at age twenty-five, the plaintiff sustained a work-related injury to her right, non-dominant wrist (R. 153-155), It was initially treated conservatively; however, diagnostic studies in October demonstrated a central tear of the triangular fibrocartilage, requiring surgical debridement and arthroscopic repair of the radial carpal joint (R. 153-155, 184, 185, 214). Both the surgery and her recovery were without complications; her condition improved with therapy; she recovered essentially a full range of wrist motion with "[zero] disability by AMA guidelines," and she returned to full-time light duty in March 1992.

Within one year following surgery, the plaintiff regained a full range of right wrist motion with a grip strength of 44 PSI; X-rays taken one year after surgery demonstrated no arthritic changes or evidence of bony instability and later EMGs were also negative (R.189, 251).

From time to time, however, she reported being bothered by right-wrist pain and difficulty using her right wrist; she received conservative care for these complaints, including several cortisone injections (R. 146-153, 189, 191, 210-212, 214, 224). As of August 1995 she was taking Tylenol "occasionally for pain, but [was receiving] no other active treatment;" in September 1995, however, she sought treatment through the emergency room at Shenandoah Memorial Hospital with complaints of acute wrist and hand pain (R. 209, 224). From then until the expiration of her insured status at the end of 1999, Ms. Barton continued to receive essentially the same conservative medical care in response to her complaints of pain on the ulner aspect of her right forearm and ulner nerve-related finger numbness (R. 187, 211, 214, 224). Treatment modalities during this period including a wrist brace, a TENS unit, outpatient therapy, therapeutic injections and also medications, which she reported "really helped" with the pain (R. 190-192, 206-211, 238-241, 251-252).

By August 1995, "Ms. Barton [was taking] Tylenol occasionally for pain but [was] in no other treatment program."(R. 214-215). She continued, however, to report experiencing pain in the ulner aspect of her right wrist, as well as numbness in the ring and little finger (R. 251). The disclosure of some ulna abnormality by X-Ray in September 1995 was followed in February 1996 by Dr. Frank McCue's orthopedic examination at University of Virginia Medical Center, which additionally demonstrated "some ulner nerve compression and symptoms in Guyon's canal" as it passed through the wrist (*Id*.). To relieve these symptoms, on July 23, 1996 Dr. McCue decompressed the Guyon canal and resected the right distal radial ulner joint (R. 258-259, 260). Following this ambulatory surgery, the surgical site healed without any

complications, and on August 6, 1996 Dr. McCue authorized her to begin a "more definitive rehab program (R. 261).

A series of three post-surgery right-wrist X-Rays, dated between in August 1996 and in January 1997, demonstrated no post-surgical complications or bone tissue abnormality (R. 242-244). During this period the plaintiff used a TENS unit at home and between August 29 and December 17, 1996 she attended a total of twenty-seven physical therapy sessions principally for pain control (R. 160-165). This resulted in some lessening of her pain symptoms, some increase in her right wrist strength and range of motion, and an increase in the functional use of her right hand (R. 162, 164).

On the basis of her ongoing complaints of persistent right hand, elbow and shoulder pain, in 1997 the plaintiff sought treatment at Rockingham Pain Center. At various times she was seen and treated by Drs. David Klein, David Glick or Bart Balint.

When first seen on February 13, 1997, Dr. Klein found the plaintiff to be alert, oriented, cooperative, and to demonstrate tenderness along her right elbow, radial nerve and associated tendon (R. 269-270). These findings suggested to him a clinical diagnosis of entrapment neuralgia of the deep radial nerve in the forearm resulting in referred pain into both the hand and arm; he instituted a treatment regime that included topical medication (flubiprofen), oral pain and anti-anxiety medications (Neurontin and Klonopin), and periodic intramuscular injections of an anti-inflammatory glucocorticoid; in August spinal cord stimulation was added as an additional treatment modality (R. 269-271, 272-277, 286-287, 299-300, 312-313, 314-315).

Complaining of having recently developed symptoms of anxiety and depression due to chronic pain, in June 1997 the plaintiff separately initiated mental health treatment with Michael Hoffman, MD. His initial assessment notes reflect diagnoses of depression and post-traumatic

stress disorder, his institution of a medication treatment regime, and his recommendation that the plaintiff "remain off from work" (R. 310-311, 426-427). After seeing the plaintiff for a single follow-up appointment in July, and without the benefit of any psychological testing or other functional assessment (R. 298, 309), Dr. Hoffman opined unequivocally that Ms. Barton had no more than a fair-to-poor ability to adjust to the occupational and performance requirements of a job and that she had the same acute difficulty making appropriate personal and social adjustments (R. 324-328).

Prior to the expiration of her insured status, the plaintiff saw Dr. Hoffman for fourteen additional 15-minute appointments (R. 308-309, 633-662, 667-670). Throughout this period, he continued to note that the plaintiff appeared alert, fully oriented, and well-groomed with good hygiene; he observed that she made fair-to-good eye contact, demonstrated only a mild-to-moderate dysphoric (depressed) mood, and to be functioning at 50-70 on the GAF scale; [9] he regularly recorded her current condition to be either *stable* or *slightly improved* and that her medication regime was therapeutic or beneficial (R. 298, 633-662, 667-670). Additionally, Dr. Hoffman's office notes record the plaintiff's multiple reports that her medication regime was helping to control her symptoms (R. 298, 636, 641, 643). Despite these findings and observations, and once again without any psychological testing or functional assessment, Dr. Hoffman for a second time unequivocally opined that Ms. Barton had no more than a fair-to-poor

---

[9] The GAF is a numeric scale ranging from zero to one hundred used by mental health clinicians to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." Diagnostic and *Statistical Manual of Mental Disorders*, Fourth Edition ("DSM-IV"), 32 (American Psychiatric Association, 1994). A specific GAF score represents a clinician's judgment of an individual's overall level of functioning; for example a GAF of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)," and a GAF of 61-70 indicates "some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

ability to adjust to the occupational and performance requirements of a job and the same acute difficulty making appropriate personal and social adjustments. (R. 629-630).

Pertinent to her medical condition, electodiagnostic studies in January 1998 disclosed right T1 and C7 nerve root impingements, arthritic changes to her right second rib, and a resolving medial cord disorder (R. 317-319, 329-350, 403, 406-418). Consistent with these findings the plaintiff underwent a series of three epidural steroid injections in June and July, which helped "a little bit" (R. 329-330, 344, 348).

After a one-year break in medical treatment, the plaintiff renewed treatment through Valley Pain Center. Nerve conduction studies at that time suggested a possible cervical radiculopathy and "possible double crush syndrome" at the right elbow (R. 403), and she was once again treated with a series of trigger-point injections to address her right wrist and shoulder pain (R. 406-418).

During this last six-month period prior to the expiration of the plaintiff's insured status, Ms. Barton continued to report right trapezius muscle pain and on examination to demonstrate related trigger-point spasm and tenderness (R. 406-418); however, during this period the Pain Center's records also show she reported that the injections had helped significantly (R. 417), that her medications were controlling her pain "reasonably well," and that she was experiencing no medication-related side effects (R. 406-418).

Dr Sherry (who began treating the plaintiff during the summer of 1999) expressed his "feeling" in an October 28, 1999 letter addressed to the plaintiff's attorney that Ms. Barton's "chronic pain problems secondary [to her 1991 work-related injury] *** limit[ed] her to minimal

activities … [and that in [his] overall opinion [she should] be considered permanently disabled"
(R.400-401

### *Medical Evidence after Date Last Insured*

After the plaintiff's last insured date, December 31, 1999, her records reflect primarily a
history of treatment for pain related to lumbar disc disease and left knee pain secondary to an
osteoarthritic inward knee deformity that waxed and waned (R. 420-422, 597-600, 752-792, 801-
831, 832, 836) and intermittent mental health treatment for moderate depression and mild
neurovegetative or panic-related symptoms "with some mild functional difficulties" (R. 428-429,
602-615, 620-622, 623-625, 626-628, 793-797, 832-835, 836-838).

### *State Agency Medical Consultants* [10]

Based on separate reviews of the medical record in May and again in August 1997 by
state agency physicians, each concluded that the plaintiff retained the functional ability to
perform a range of light work notwithstanding her right upper extremity limitations (R. 61, 63,
278-285, 301-307, 458). Based on a similar assessment of the record in August 1997, a state
agency psychologist concluded that the plaintiff's symptoms of sleep disturbance, decreased
energy and disturbance of mood were "not severe" (R. 63, 288-296, 458).

### *Vocational Testimony*

During the most recent administrative hearing the ALJ described a hypothetical
individual with the Ms. Barton's vocational profile, with an ability to lift 10 lbs. frequently and
20 lbs. occasionally; with an ability to sit for six hours during a normal eight-hour day; with an

---

[10]  State agency medical and psychological consultants are "highly qualified … experts in the evaluation of the
medical issues in disability claims under the Social Security Act." 20 C.F.R. § 404.1527(e)(2)(i);

ability to stand or walk for four hours during a normal eight-hour day; with an ability to stand for two or three minutes at a workstation every hour; with an ability occasionally to use the non-dominant right hand to handle or finger; with an ability occasionally to climb stairs or ramps, balance, stoop, kneel, crouch or crawl; with an ability occasionally to tolerate expose to vibration; with an ability to understand, remember and carry-out short simple instructions; with an ability occasionally to be in contact with supervisors, co-workers and the public, and with no ability to climb ladders, ropes or scaffolds (R. 888). Such a hypothetical individual, in the opinion of the vocational witness, could perform a significant number of light, unskilled jobs existing in the national and local economy, and as representative examples she cited mail clerk and counter clerk as representative examples (R. 890-891)

## VI.  DISCUSSION

On appeal the plaintiff advances only the general argument that the ALJ erred by failing to find that in combination her exertional and non-exertional impairments made her "disabled as a matter of law" (docket # 11, p 2). In response, the Commissioner argues that substantial evidence supports the ALJ's determination on this point (docket #15, pp 12-20).

As framed by the plaintiff and as noted by the Commission in her brief, this argument compels the court to note at the outset the fact that "[a] claimant for disability benefits bears the burden of proving a disability." *Hall v. Harris*, 658 F.2[d] 260, 264 (4th Cir. 1981). By definition, such a "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (quoting 42 U.S.C. § 423(d)(1)(A)); *Pass v. Chater*, 65 F.3[d] 1200, 1203 (4th Cir. 1995). And in the context of this case, it means such a "disability" must have begun before the

expiration of her insured status on December 31, 1999. *Johnson v. Barnhart*, 434 F.3[d] 650, 655-656 (4th Cir. 2005) (holding that a claimant must prove she is disabled before the expiration of her insured status).

In the instant case, it must be further noted that the ALJ followed the five-step sequential evaluation process mandated in the agency's regulations to determine whether Ms. Barton had a disabling mental or physical condition within the meaning of the Social Security Act. 20 C.F.R. § 404.1520; *see Barnhart v. Thomas*, 540 U.S. 20, 24-25(2003). And at steps one through four the plaintiff has the burden of production and proof. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Radford v. Colvin*, 734 F.3[d] 288, 291 (4th Cir. 2013).

Proceeding in accord with the sequential evaluation process, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date through her date last insured (R. 457). Although the ALJ made this step-one finding favorable to the plaintiff, he took note in his decision of the fact Ms. Barton had actively looked for work and made application to attend school during this period, which "show[ed] that [she] was not as limited as alleged. *Id*.

Based on "its consistency with the evidence," at step two the ALJ gave "great weight" to the earlier (February 28, 2001) ALJ finding (R. 361-370) that the plaintiff had the following *severe* impairments during the relevant period: residuals of surgery on the right shoulder, numbness in the right hand, obesity, depression and anxiety (R. 457). On appeal the plaintiff neither contests this finding nor suggests a failure on the part of the ALJ to identify any other physical or mental impairment that significantly impacted her ability to work. See 20 C.F.R. § 404.1523.

At step three, the ALJ undertook a thorough evaluation of the plaintiff's impairments, either individually and in combination, to determine whether they met or medically equaled the requirements of any listed impairment, including a comprehensive analysis of listings 1.02 and 1.04 as they related to the plaintiff's musculoskeletal impairments and obesity (R. 459), of listing 11.01 as it related to the her neurological deficit and obesity (R. 459), and of listings 12.04 and 12.06 as they related to her mental impairments (R. 460). The ALJ cited to the specific criteria of each of these listings, and addressed which of the criteria had not been established.

For listings 1.02 and 1.04 the ALJ found that Ms. Barton had failed to establish any resulting inability to ambulate effectively as described in listing 1.00B2b" or any resulting inability to perform fine and gross movements "as defined in listing 100B2c" (R. 459). Considering listing 11.04 in conjunction with any obesity-related neurologic deficit, the ALJ found no evidence of any resulting in muscular dystrophy or peripheral neuropathies with disorganization of motor function "as described in listing 11.04B" and no evidence of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see listing 11.00C). Considering the severity of the plaintiff's mental impairments, both singularly and in combination, in relation to the criteria of listings 12.04 and 12.06, the ALJ outlined in detail the failure of the plaintiff's evidence to establish the "paragraph B" criterion either of "marked" restrictions of activities at least two domains of functioning or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, or alternatively to establish the "paragraph C" criteria (R. 460-461)

Therefore, the ALJ's conclusion Ms. Barton failed establish that her medical and mental disorders met or medically equaled a listed impairment(s) is supported by substantial evidence,

and the non-specific conclusory assertion by plaintiff's counsel during oral argument that his client's various disorders "in combination" met the listings is totally devoid of merit.

After concluding Ms. Barton's impairments were not of listing-level severity during the decisionally relevant period, the ALJ made his residual functional capacity assessment and concluded she retained the functional ability to perform a limited range of activities at a light exertional level (R. 461). That determination accounted for all of plaintiff's functional limitations that were established in the record, and substantial evidence supports this evaluation of the plaintiff's impairments.

The ALJ then proceeded to consider Ms. Barton's symptoms and the extent to which these symptoms could be reasonably accepted as consistent with the objective medical and other evidence (R. 461). In doing so, the ALJ followed the requisite two-step credibility assessment process for determining whether a person is disabled by pain or other symptoms. *Craig v. Chater*, 76 F.3[d] 585, 594 (4th Cir. 1996). Based on his analysis of the "entire case record," the ALJ first concluded that the plaintiff's medically determinable mental and physical impairments could be expected to produce pain and her other subjective symptoms; he discussed the evidence that contradicted her subjective complaints and alleged limitations, and he concluded that the objective findings in the record "do not support any condition which would cause the degree of limitations alleged by the [plaintiff]" (R 461-463). Therefore, to the extent the plaintiff is suggesting on appeal the ALJ's analysis of the plaintiff's credibility was based upon erroneous fact finding and reasoning, such a contention is without merit. Substantial evidence in the record more than adequately supports the ALJ's assessment of the plaintiff's credibility.

The ALJ also appropriately completed the final step in the agency's sequential evaluation process. After concluding the plaintiff could not perform any of her past relevant work and

relying on vocational testimony taken during the August 30, 2012 administrative hearing, the ALJ made the ultimate determination that during the relevant period there was other available work in the national economy she could perform consistent with the ALJ's residual functional capacity determination (R. 464-466).

*Inter alia*, during oral argument plaintiff's counsel attacked generally the ALJ's non-disability finding on the basis of his failure to give controlling weight to the opinions of her treating physicians concerning the extent of her functional limitations. At its core, this claim questions the completeness of the ALJ's hypothetical question at step five. As support for this contention, plaintiff's counsel pointed to Dr. Hoffman's longitudinal history of mental health treatment and multiple statements concerning the plaintiff's significant mental-health related limitations (R.324, 629), to Dr. Klein's treatment history and opinion concerning the plaintiff's significant functional limitations resulting from her 1991 work-related injury (R. 286-287, 299-300), and to Dr. Sherry's October 1999 opinion concerning the plaintiff's disabling functional limitations (R. 400-401). On review this argument too lacks merit.

A treating physician's opinion, merits controlling weight only when two conditions are met: (1) the opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) it must not be inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2); *Craig v. Chater*, 76 F.3$^d$ at 590. Moreover, a treating physician's speculation concerning an individual's employability or opinion on the ultimate issue of disability carry no valuable probative weight. SSR 96-5p; *see Blevins v. Astrue*, 2012 U.S. Dist. LEXIS 42229, *18 (WDVa. Mar. 28, 2012); *Green v. Astrue*, 2011 U.S. Dist. LEXIS 133036, *17 (EDVa. Oct. 1, 2011)

In the instant case, the ALJ provided the appropriate analysis concerning the opinions of these three medical sources. The decisional weight he assigned to each is supported by substantial evidence. In doing so, he expressly acknowledged SSR 96-2p's provision concerning the weight to be given treating source medical opinions, and he similarly recognized pertinent reserved rights of the Commissioner pursuant to SSR 96-5p (R. 464). Consistent therewith, the ALJ then evaluated the treating source opinions of Drs. Klein, Sherry and Hoffman which addressed most directly with the plaintiff's medical condition during the decisionally relevant period (R. 464).

Directly pertinent to the decisionally relevant period, the ALJ evaluated Dr. Klein's opinion letter, dated August 14, 1997, in which he reported that he was treating the plaintiff for a residual cervical radiculopathy related her 1991 work-related injury, and it was his opinion that this condition represented a "40% total body disability" which rendered her "wholly and totally" unable to perform her past work (R.286-287, 464). Twenty- six months later and shortly before the plaintiff's insured status expired, Dr. Sherry similarly reported that he was treating her for a chronic pain condition associated with her 1991 wrist injury, and he opined that she was "limit[ed] … to minimal activities" and was "permanently disabled" (R. 400-401, 464). Likewise, he evaluated Dr. Hoffman's several statements concerning the plaintiff's mental health issues, focusing most particularly those relating directly to the relevant period (R. 297-298, 323-327, 629-630). In each instance the ALJ found these opinions not to be consistent either with the overall medical record or with the treating source's own treatment notes (R. 464). In each instance, the ALJ gave these opinions "little weight," and given the fact that her mental health issues worsened after 1999, the ALJ found Dr. Hoffman's later opinions to have "little probative value" as to the Ms. Barton's condition in 1999 (*Id*.).

Each of these findings is supported by substantial evidence. As the ALJ mentioned, during the decisionally relevant period the plaintiff's medical and mental health treatment was conservative and suggested no disabling condition (R. 464, 163-164, 191, 268-277, 329-350, 411, 417). Similarly, he took note of "her admitted" activities, including looking for work and obtaining her GED, which were inconsistent with a disabling condition before her last insured date (R. 464, 41-43, 101, 215-217, 226, 434, 460, 464-465). Additionally, the record contains no finding or substantive suggestion that she experienced any significant medication-related side effects related to her pharmacologic treatment for pain (*See* R. 268-277, 312-315, 406-418). These treating source opinions were also inconsistent with the relevant findings and impressions of the state agency physician and the state agency psychologist who conducted record reviews as part of the administrative adjudication of plaintiff's claim (R. 278-285, 288-296). Each is unsupported by any functional capacity testing or assessment, and each speaks to the plaintiff's disability, an issue reserved to the Commissioner. Thus each is not a medical opinion as defined by the regulations. Social Security Regulation ("SSR") 96-5p. Accordingly, the Commissioner did not err in failing to give this opinion any decisionally significant weight.

## VII. PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis and the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.      The plaintiff's insured-status expired on December 31, 1999;

2.      The plaintiff is left-hand dominant;

3.      The plaintiff injured her right wrist in an industrial accident in 1991;

4.      Substantial evidence in the record supports the ALJ's assessment and the decisional weight given to the medical source statements of Drs. Klein, Sherry and Hoffman;

5.      Substantial evidence exists in the record to support the ALJ's physical residual functional capacity finding;

6.      The plaintiff failed to establish that her medical and mental disorders met or medically equaled a listed impairment(s), and the ALJ's finding that her medical and mental disorders neither met nor medically equaled a listed impairment(s), is supported by substantial evidence;

7.      Substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding;

8.      Substantial evidence exists in the record to support the ALJ's finding that the plaintiff was not disabled within the meaning of the Act prior to the expiration of her insured status; and

9.      The plaintiff has failed to meet her evidentiary burden to establish entailment to a period of DIB.

10.     All facets of the Commissioner's final decision are supported by substantial evidence;

11.     The ALJ fulfilled his basic obligation to develop a full, fair and adequate record;

12.     The plaintiff has not met her burden of proving a disability during the decisionally relevant period; and

13.     The final decision of the Commissioner should be affirmed.


## VIII.   DIRECTIONS TO CLERK

The clerk is directed to transmit the record in this case immediately to the presiding

district judge and to transmit a copy of this Report and Recommendation to all counsel of record.


## IX.   NOTICE TO THE PARTIES

Both sides are reminded that pursuant to Rule 72(b) of the Federal Rules of Civil

Procedure, they are entitled to note objections, if any they may have, to this Report and

Recommendation within fourteen (14) days hereof.  Any adjudication of fact or conclusion of

law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: This 20th day of May 2014.

*/s/James G. Welsh*

United States Magistrate Judge